IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COASTAL HABITAT ALLIANCE, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| JERRY PATTERSON in his official capacity | § | |
| as COMMISSIONER OF THE TEXAS | § | **A07CA 985LY** |
| GENERAL LAND OFFICE, and | § | |
| | § | |
| CHAIRMAN BARRY SMITHERMAN and | § | |
| JULIE CARUTHERS PARSLEY and PAUL | § | |
| HUDSON, each in their official capacity as | § | |
| COMMISSIONERS OF THE TEXAS | § | |
| PUBLIC UTILITY COMMISSION, and | § | |
| | § | |
| TEXAS GULF WIND LLC wholly owned by | § | |
| BABCOCK & BROWN RENEWABLE | § | |
| HOLDINGS, INC. | § | |
| | § | |
| PPM ENERGY, INC. | § | |
| | § | |
| *Defendants* | § | |
| | § | |

## ORIGINAL COMPLAINT
### WITH APPLICATION FOR DECLARATORY AND INJUNCTIVE RELIEF

**COMES NOW**, Coastal Habitat Alliance (the "Alliance"), an organization of multiple members seeking to protect the Texas Gulf Coast environment, complaining of Jerry Patterson as the Commissioner of Texas General Land Office ("Land Office"), the Texas Public Utility Commission ("PUC"), and Texas Gulf Wind ("Gulf Wind") wholly owned by Babcock & Brown Renewable Holdings ("Babcock & Brown"), and PPM Energy ("PPM") seeking to build two huge wind energy generation facilities (also called wind farms) that will cause devastating environmental consequences, all in violation of federal law.

1.

## I.   INTRODUCTION AND SUMMARY OF THE CASE

1.     Plaintiff files this case to protect a vital, unique part of the Texas Gulf Coast.  As recognized by the Texas Department of Parks and Wildlife, the area "has been described in the scientific literature as 'the last great habitat' due to the large expanses of undeveloped land in one of the most biologically diverse areas in the nation".  Defendants, in violation of the Coastal Zone Management Act ("CZMA") and the Texas Coastal Management Program ("Texas CMP"), plan immediate, irreparable harm by industrializing sixty thousand (60,000) acres of this pristine, fragile ecosystem adjoining Laguna Madre in Kenedy County.  At risk:  multiple endangered and threatened species as identified by both the federal government and Texas; the Laguna itself – one of only three hypersaline bays in the world – with precious nearby wetlands; and – in far greater concentrations than at any other existing wind farm in the United States – uncountable numbers of birds that fly three major migratory pathways all converging on this special place that – like the Everglades and no other comparable coastal zone – shows no lights at all when viewed at night.  Plaintiff elaborates on the environmental and other dangers below.

2.     The proposed industrialization includes building two wind energy generation facilities, one by Gulf Wind/Babcock & Brown, one by PPM Energy.  The first development phases include: 240 massive towers (over 400 feet tall, weighing 160 plus tons, with rotor blades themselves each 300 feet in diameter spinning at six times the wind speed);  each sitting on 1000 plus tons of concrete plugging deep in native soil; all interconnected by more than 20 miles of roads and transmission lines with 150' to 300' rights of way that would divide and destroy this coastal resource.

3.     This is precisely the type of development that, fortunately, both the CZMA and Texas CMP absolutely preclude before completion of careful environmental review and a

consistency determination, including public participation through which Plaintiff will prove the folly of – and attempt to stop – the challenged wind energy facilities.  Defendants, unlawfully, seek to build these electrical generation facilities with no environmental review, no consistency determination, and no public participation. Existing law requires environmental review and consistency determination, entitling Plaintiffs to be heard before Defendants clear, dig, build and operate these wind farms.

4.      The mandates for environmental review, consistency determination, and public participation arise under the CZMA, which creates a partnership offering federal money and other benefits to states if they (a) choose to join, (b) submit a program that secures federal approval, and (c) implement the program.  Texas chose to join with the federal government in 1995, and submitted the proposed Texas CMP, which the federal government approved in 1996 after completing an environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA").  The CZMA, and the approved Texas CMP, each expressly requires careful review of the environmental impacts of all energy generating facilities (including wind farms) before construction, and requires meaningful public participation for all "interested and affected parties". 15 C.F.R. § 923.13(d). To enforce the mandates of the CZMA and approved Texas CMP, to which Texas committed, Plaintiff seeks a declaration of rights and injunction against construction before completion of the environmental review.

5.      In some circumstances, states can change an approved coastal program. However, the CZMA ensures that no such amendment could eliminate all environmental review of energy generating facilities built in the Texas coastal zone.  The CZMA also establishes that any such amendment would require disclosures, opportunities for informed public participation,

and federal approval – none of which has been done. Significant changes would require a new or supplemental EIS under NEPA, with additional public input, which has not occurred.

6.     Texas has no authority to unilaterally disregard the obligations it undertook by adopting the Texas CMP and joining the federal CZMA partnership. Plaintiff has indisputable rights to be heard, both with respect to coastal energy facilities and to any amendments to the Texas CMP, so any unilateral state decision destroying these rights would deny constitutional duties of Due Process.

7.     In 1999, Texas partly deregulated the electric industry by repealing a statute (part of the Public Utility Regulatory Act, or "PURA") that required the Public Utility Commission ("PUC") to issue a Certificate of Convenience and Necessity ("CCN") before building any energy generating facility, including wind farms. This requirement to obtain a CCN before construction had been part of PURA since its adoption in 1975. In 1995, when Texas sought federal approval of the Texas CMP; the federal government relied on PURA (citing Tex. Rev. Stat. § 1446c) when approving the Texas CMP. If repeal of this statutory provision means no forum now exists to complete CZMA reviews for massive wind farms generating electricity, then the CZMA and Texas CMP preclude building such wind farms on the Texas Coast.

8.     Defendant Jerry Patterson, Commissioner of the Texas General Land Office and Chair of the Texas Coastal Coordination Council, deliberately decided not to disclose the repeal of the PURA statute, or to seek public comment or federal approval of any change this might cause the Texas CMP. In 2006, Defendant Patterson submitted a long list of other (supposedly) "routine program changes" for comment and approval, claimed these reflected all changes made since federal approval in 1996, and never mentioned the PURA amendment removing electrical generating facilities from PUC review. Defendant Patterson's submission instead refers to other

statutes and regulations that reflect PUC power to conduct the CZMA review as part of the process to obtain a CCN. In the section of this submission identifying changes, no changes are noted for the PUC other than renumbering of various sections.

9.     Defendant Patterson has continued to seek and obtain federal CZMA money based on the representations in the approved Texas CMP that electrical generating facilities in the coastal zone will be subject to proper environmental review.  However, Texas, cannot accept the federal benefits without also accepting federal duties.  Texas benefits so long as the federal money continue to flow, but it must deliver the regulatory program as promised as a *quid pro quo* for receipt of the benefits.  This case seeks to assure continuation of these benefits, by enforcing the clear mandates that stop the wind farms from being built absent environmental review required and promised by the CZMA and the approved Texas CMP.

10.     Plaintiff's members include leading Texas organizations dedicated to protecting the Laguna Madre specifically, as well as birds, endangered species, wetlands, and other aspects of the environment, as well as leading area ranchers, all of whose economic and recreational, as well as environmental interests will be harmed should Defendants proceed with their current plans, and no environmental review. The value of "the last great habitat" is so significant, and threatened harm so great, that Plaintiff will seek a preliminary injunction if Defendants do not agree to postpone their construction pending judicial review.

## II.     JURISDICTION, VENUE, AND RELIEF

11.     This Court has jurisdiction. 28 U.S.C. §§ 1331 & 1343(a).

12.     Venue is proper. 28 U.S.C. § 1391(b).

13.     Federal law authorizes relief. 42 U.S.C. §§ 1983 & 1988; 28 U.S.C. §§ 2201-02; Fed. R. Civ. P. 57 & 65.

### III.   PARTIES

14.    Plaintiff Coastal Habitat Alliance ("Alliance") is a non-profit corporation comprised of various organizations with missions to protect one of the Nation's most unique and important ecological assets – the Texas Gulf Coast.  Alliance members include (among others):

   a.  Audubon Outdoor Club of Corpus Christi – A nonprofit organization dedicated to encouraging and perpetuating the observation and conservation of wildlife.

   b.  Coastal Bend Audubon Society – A group working to protect avian species throughout the Coastal Bend Region, which includes Kenedy County, Texas.

   c.  Frontera Audubon Society – A private, nonprofit organization dedicated to the conservation of the environment of the Lower Rio Grande Valley.

   d.  Galveston Bay Conservation and Preservation Association – A nonprofit organization of persons working to keep the Bay waterways and adjacent land areas suitable as a recreational and living environment.

   e.  Houston Audubon Society – A nonprofit organization working to promote the conservation and appreciation of birds and wildlife habitat.

   f.  King Ranch, Inc. – An 825,000-acre ranch and Registered National Historic Landmark with a primary concentration on ranching, agriculture and recreationally oriented wildlife management.

   g.  Lower Laguna Madre Foundation – A nonprofit organization working to protect the living resources of the lower Laguna Madre, located along the Gulf Coast

   h.  Matagorda Bay Foundation – A nonprofit organization dedicated to the preservation and protection of Matagorda and San Antonio Bays.

Plaintiff Alliance and its members have been denied any opportunity to participate in any proceeding regarding a CCN, or any other proceeding in which to obtain environmental review and to assure consistency with Texas CMP regarding the challenged wind farms. Construction, operation, and maintenance of these wind farms will harm Alliance members' economic, environmental, and recreational interests uniquely entwined with the endangered and threatened species, Laguna Madre and surrounding wetlands, as well as migratory birds and animals living in, travel through, and otherwise using "the last great habitat".

      15.    Defendant Jerry Patterson is sued in his official capacity as Commissioner of The Texas General Land Office ("Land Office").

      16.    Defendants Barry Smitherman, Julie Caruthers Parsley, and Paul Hudson, are sued in their official capacity as Commissioners of the Texas Public Utility Commission ("PUC").

      17.    Defendants Babcock & Brown Renewable Holdings, Inc. ("Babcock & Brown") and its wholly owned Texas Gulf Wind LLC ("Gulf Wind") seek to build a wind farm (called the Superior Project) in the coastal area that should be protected.

      18.    PPM Energy, Inc. ("PPM") seeks to build a wind farm (called the Penascal Project) in the coastal area that should be protected.

## IV. THE CZMA, AND APPROVED TEXAS CMP, REQUIRE ENVIRONMENTAL REVIEW, WITH MEANINGFUL PUBLIC PARTICIPATION, BEFORE BUILDING THE CHALLENGED WIND FARMS & TRANSMISSION LINES

      19.    By enacting the Coastal Zone Management Act ("CZMA") in 1972, Congress sought to protect and ensure wise use of our Nation's coastal zone. 16 U.S.C. § 1452. *See also id.* § 1451 (findings on need for the CZMA).

20.    Texas also recognizes the need to conserve coastal resources. See Texas Natural Resources Code § 33.201 *et seq.* (Texas Coastal Coordination Act).

21.    The CZMA offers a federal-state partnership, in which states obtain significant financial and other support in return for committing to implement federal requirements. *Infra* Part IV.A.1. Texas has made the commitments, and joined the partnership. *Infra* Part IV.A.2.

22.    For energy generating facilities, the CZMA specifically requires states to conduct environmental review and a consistency determination before any development in a coastal zone and, within that review, to allow meaningful public participation. *Infra* Part IV.B.1. Texas committed to these requirements that apply to the wind farms now at issue. *Infra* Part IV.B.2.

23.    The CZMA also requires disclosure, meaningful public participation, and federal approval before a state changes how it implements the CZMA; significant changes require review under NEPA, 42 U.S.C. § 4321 *et seq. Infra* Part IV.C.1. A decade after committing to implement CZMA requirements, Texas disclosed "routine program changes", but Texas never disclosed, sought public input on, or obtained federal approval to change review or licensing of energy generating facilities, including wind farms, in the coastal zone. *Infra* Part IV.C.2.

A.    **Texas Committed to Follow CZMA Requirements with the Texas CMP**

24.    Congress found that, before enacting the CZMA, many state efforts to manage the coastal zone were inadequate. 16 U.S.C. § 1451(h). Recognizing the national interest to improve coastal zone management, Congress offered financial and technical assistance to those states that commit to implement CZMA requirements. *E.g., id.* §§ 1455 (a & c); 1455a; 1455b; 1456a; 1456b (money); §§ 1455a(f); 1455b(b)(4) & (d) (technical assistance).

25.    The CZMA offers a special type of contract. States are not required to enter into the partnership offered by the federal government. Similarly, the federal government does not

have to enter into a relationship with a state if it deems the state's coastal management plan to be deficient. The considerations exchanged in the contract include cash from the federal government to the state government in exchange for a state program designed to protect the coastal zone in accordance with specific federal rules, some of which give "interested and affected parties", public and private, specific rights. So long as a state remains in the partnership, it must follow the CZMA mandates for a national system of coastal management, including mandates for environmental review, consistency determinations, and public participation

### 1.   *To Get Federal Benefits, States Must Commit to Federal Requirements*

26.    In 16 U.S.C. § 1454, Congress provided that, to obtain federal money and other help, states must submit proposed coastal management programs to the Secretary of Commerce for review and approval pursuant to the Act's section 306, that is, 16 U.S.C. § 1455.

27.    States cannot obtain federal assistance unless the Secretary "finds that the management program of the coastal state meets all applicable requirements of" the CZMA and approves the proposed program. *Id.* § 1455 (b & c). *See also id.* § 1456(b) (Secretary must consider the views of other affected federal agencies).

28.    Congress specified multiple requirements for approval of any state's program. *E.g., id.* § 1455(d). Also, state programs must be "developed and adopted … in accordance with [federal] rules and regulations". *Id.* § 1455(d)(1). See 15 C.F.R. Part 923 (CZMA regulations).

### 2.   *Texas Submitted its CMP, Approved after NEPA Review*

29.    In 1995, Texas sought to join the CZMA partnership by making the commitments required in a proposed Texas Coastal Management Program ("Texas CMP").

30.    NEPA required an environmental impact statement to be prepared by the federal government before any approval of the Texas CMP.  In preparing the Final Environmental

Impact Statement ("FEIS"), see www.glo.state.tx.us/coastal/ccc.html (Aug. 1996), the federal government reviewed the Texas CMP (which was Part II of the FEIS). For this required review, the federal government relied on commitments in the Texas CMP.

31.     Following completion the FEIS, the Secretary of Commerce approved the Texas CMP. In December 1996, Texas joined as a partner, required to implement the CZMA.

**B.    Relevant CZMA Requirements Apply to the Wind Farms & Transmission Lines**

32.     The CZMA requires "identification of the boundaries of the coastal zone subject to the management program". 16 U.S.C. § 1455(d)(2)(A); 15 C.F.R. § 923.31-34.

33.     The designated Texas coastal zone covers the area where Defendants Gulf Wind, Babcock & Brown, and PPM seek to build winds farms at issue. See 31 T.A.C. § 503.

**1.    *Enforceable Consistency Requirements for Energy Generating Facilities, Including Public Participation***

34.     The CZMA requires each state to have legally enforceable power to ensure development in the coastal zone is consistent with the approved management program. As an overarching requirement, the CZMA requires that "[t]he State, acting through its chosen agency or agencies ... has authority for the management of the coastal zone in accordance with the management program. Such authority shall include power -- (A) to administer land use and water use regulations to control development, *to ensure compliance with the management program*, and to resolve conflicts among competing uses." 16 U.S.C. § 1455(d)(10) (emphasis added). *See also, e.g., id.* § 1455(d)(2)(D) (CZMA requires "a list of relevant State constitutional provisions, laws, regulations, and judicial decisions" available to the State); 15 C.F.R. § 923.40-.43 (state must identify the means to exert control over uses).

35.     For energy facilities, the CZMA expressly mandates regulation to assure consistency with the management program. States must implement "[a] planning process for

energy facilities likely to be located in, or which may significantly affect, the coastal zone, including a process for anticipating the management of the impacts resulting from such facilities." 16 U.S.C. § 1455(d)(2)(H).

36.     The CZMA specifically defines "energy facilities" to include "electric generating plants" and "transmission facilities". *Id.* § 1453(6).

37.     The CZMA allows three techniques, or a combination thereof, "for control of land uses and water uses within the coastal zone". *Id.* § 1455(d)(11).  These are:

> (A)     State establishment of criteria and standards for local implementation, subject to administrative review and enforcement.
>
> (B)     Direct State land and water use planning and regulation.
>
> (C)     State administrative review for consistency with the management program of all development plans, projects, or land and water use regulations, including exceptions and variances thereto, proposed by any State or local authority or private developer, with power to approve or disapprove after public notice and an opportunity for hearings.

*Id.*  Thus, for energy facilities, Texas CMP must require a permit, or use a similar process, to determine consistency with the CZMA. *Accord* 15 C.F.R. § 923.41 - .44.  Texas also must assure all its agencies adhere to the management program. 16 U.S.C. § 1455(d)(15).

38.     For all decisions regarding coastal zone development, the CZMA requires each state's "management program provides for *public participation* in permitting processes, consistency determinations, and other similar decisions." *Id.* § 1455(d)(14) (emphasis added).

39.     Federal regulations governing the "[e]nergy facility planning process" tie these requirements together. 15 C.F.R. § 923.13.  After restating there must be a planning process, the federal regulations require:

> (a)     Identification of energy facilities which are likely to locate in or which may significantly affect a State's coastal zone;

(b)        Procedures for assessing the suitability of sites for such facilities designed to evaluate, to the extent practicable, the costs and benefits proposed and alternative sites in terms of State and national interests as well as local concerns;

(c)        Articulation and identification of enforceable State policies, authorities, and techniques for managing energy facilities and their impacts; and

(d)        Identification of how interested and affected parties will be involved in the planning process.

*Id.* It makes good sense that management programs must enforce consistency requirements for energy generating facilities, because of their inevitable significant impacts.

40.    The wind farms at issue clearly fit within the CZMA definition of "energy facilities". Thus they must be regulated for consistency including environmental review, subject to binding state law. 16 U.S.C. § 1455(d)(10 & 11). For these projects, the CZMA mandates meaningful "public participation in permitting processes, consistency determinations, and other similar decisions". *Id.* § 1455(d)(14). All "interested *and* affected parties *will* be involved". 15 C.F.R. § 923.13(d) (emphasis added).

### 2.    *The Texas CMP, as Approved, Mandates Consistency Determinations for Wind Farms Including Public Participation*

41.    The Texas CMP, as approved by the federal government, includes enforceable consistency requirements for energy generating facilities, with provisions for public participation. The following cites to the Texas CMP come from the version approved by the federal government in 1996, and included in the FEIS, cited *supra* ¶30.

42.    The Texas CMP establishes "a 'networked' program linking the regulations, programs, and expertise of state, federal, and local agencies that manage various aspects of coastal resource use." Texas CMP, Chapter I.B.

43.    As the very first coastal zone use identified specifically to be managed subject to binding policies, the Texas CMP identified "[e]lectric generating and transmission facilities

include siting, construction, and maintenance of electric generating facilities, electric transmission lines, and associated facilities such as waste management, and activities associated with access." *Id.* Chapter I.E.

44.     The first of the "Enforceable Policies of the Texas CMP" expressly concerns "Construction of Electric Generating and Transmission Facilities". *Id.* Chapter IV.D.  According to the stated enforceable policy, "[c]onstruction of electric generating facilities and electric transmission lines in the costal zone shall comply with" stated policies concerning environmental review and consistency determinations. *Id.*  The rules expressly contemplate CZMA consistency determinations with environmental review during process when the PUC considers granting a certificate of convenience and necessity ("CCN"). *Id.*  Texas wrote similar provisions written in state regulations, 31 T.A.C. § 501.14(a)(1 & 2), *later renumbered* 31 T.A.C. § 501.16 (a & b).

45.     For the past decade, Texas regulations (31 T.A.C. § 25.102, *previously see* 16 T.A.C. § 23.31) have stated:  "The [PUC] may grant a [CCN] for the construction of generating or transmission facilities within the coastal boundary ... only when it finds that the proposed facilities are consistent with the applicable goals and policies of the [Texas CMP] specified in 31 T.A.C. § 501.14(a) (*renumbered*  § 501.16), or that the proposed facilities will not have any direct and significant impacts on any of the applicable coastal natural resource areas specified in 31 T.A.C. § 501.3(b)."

46.     "Construction of electric generating facilities and electric transmission lines in the coastal zone shall comply with the policies in this section." 31 TAC § 501.16(a).

47.     It is the policy of the Texas Coastal Management Plan that ""[e]lectric generating facilities shall be constructed at sites selected to have the least adverse effects practicable on ...

areas used for spawning, nesting, and seasonal migrations of ... wildlife species." 31 T.A.C § 501.16(a)(3).

48.     "The PUC shall comply with the policies in this section when issuing certificates of convenience and necessity and adopting rules under the Public Utility Regulatory Act, Texas Utilities Code §11.001, et seq., governing construction of electric generating facilities, electric transmission lines, and associated facilities in the coastal zone." 31 TAC § 501.16(b). *See also* Texas Natural Resources Code § 33.205(a & b) & § 33.2053(b) (whenever it issues CCNs, the PUC shall assure consistency with the Texas CMP, confirmed in writing).

49.     In 1995 and 1996, when the federal government evaluated and approved the Texas CMP, the PUC had express authority regarding required CCNs for electric generating facilities under then then-recently enacted Public Utility Regulatory Act of 1995. Tex. Civ. Stat. art. 1446c-0, § 2.255(e) (*see also* PURA Section 37.058, repealed by Acts 1999, 76 th Leg.,R.S., ch. 405 (SB7) § 61). The federal FEIS, in its Appendix D, cited § 1446-c as the first among the "Networked Agency Statutory Authorities" on which to base federal approval. *See also infra* Part VI (discussing Texas deregulation removing CCN jurisdiction from the PUC, without disclosure, public participation, or federal approval under the CZMA).

50.     In addition, in its Chapter VI.C. ("Special Planning Elements"), the Texas CMP restated requirements of the CZMA (statute and regulations) applicable to "Energy Facility Siting". In Chapter VI.C.4, the Texas CMP reaffirmed that *"[s]iting of energy facilities, such as ... utilities, will be subject to the regulatory authorities* for such facilities, including ... [for] electric power generation, transportation, and distribution", the PUC. (Emphasis added.)

51.     In Chapter VI.C.5, the Texas CMP stated the "involvement of ... the public ... in the development and implementation of the CMP and in energy facility siting are described in

Part II, Chapter Eight ….”  In that Chapter VIII.C, the Texas CMP discussed public participation during program implementation, including "public participation prescribed by the permitting procedures of individual agencies", such as the PUC.

52.     As part of public participation, the Texas CMP specifically elaborates that: "Third parties (including citizens …) can administratively challenge agency determinations.  For example, a party can challenge agency consistency determinations in a contested case hearing before an agency.  Third parties can also seek judicial review of agency/subdivision consistency determinations, as provided by law." *Id.* Chapter III.C(3).

53.     Thus, on its face, the Texas CMP expressly provides for critical aspects of the CZMA:  all proposed energy generating facilities shall be subject to environmental review and consistency determinations as part of the CCN process, through the PUC; and "interested as well as affected parties" can participate in that administrative process, with the right to seek judicial review.

**C.     No Relevant Amendments Regarding Energy Facilities under the Texas CMP Have Been Disclosed for Public Comment or Federal Approval**

54.     Given the specific CZMA requirements, *quoted supra* Part IV.B.1, the Texas CMP could not be lawfully amended to eliminate environmental review and consistency determination, including public participation, for energy generating facilities.

55.     In any event, no effort has been made to amend the Texas CMP to eliminate such review, so under the approved Texas CMP the challenged wind electric generating facilities cannot be built without PUC review of the facilities for consistency with the Texas CMP, after public participation.

1.    *The CZMA Sets Strict Requirements to Amend a Management Program*

56.    Upon obtaining approval for a management program, with a limited exception not relevant here, "a coastal state may not implement any amendment, modification, or other change as part of its approved management program unless the amendment, modification, or other change is approved by the Secretary" of Commerce. 16 U.S.C. § 1455(3)(3)(A).

57.    States "*shall promptly notify* the Secretary of any proposed amendment, modification, or other program change and submit it for the Secretary's approval." *Id.* § 1455(e)(1) (emphasis added).

58.    Public input also is required, including "the opportunity of full participation by ... interested parties and individuals, public and private". Id. § 1455(d)(1); 15 C.F.R. §§ 923.3 & .58.

59.    Federal regulations governing "Amendments to and Termination of Approved Management Programs" confirm key points with specific details. 15 C.F.R. § 923.80-.84

60.    "Whenever possible, requests should be submitted prior to final State action to implement the amendment.    At least *one public hearing must* be held on the proposed amendment, subject to [16 U.S.C. § 1455(d)(4)]", after at least 30 days notice with pertinent materials made available to the public. 15 C.F.R. § 923.81(a) (emphasis added).

61.    Notice must describe the amendment and explain "why the change is necessary and appropriate". *Id.* § 923.81(b)(1 & 2).   There must be "[d]ocumentation of opportunities provided ... [for] interested public and private parties to participate in the development and approval of the proposed amendment." *Id.* § 923.81(b)(5); *see also id.* § 923.84(b)(2 & 4) ("notice to the general public and affected parties" required even for "routine program changes").

62.     The previously discussed requirements, including enforceable consistency determinations regarding energy facilities, *supra* Part IV.B, must be met by the proposed state program as revised. 15 C.F.R. § 923.82(a).   If the proposed amendment is not denied after preliminary review, the federal government then determines whether, under NEPA, "an environmental impact statement is required." *Id.* § 923.82 (b & c).   If so, that process requires further federal environmental review and public participation, subject to judicial review.

### 2.     The Texas CMP Regarding Energy Facilities Never Has Been Amended

63.     No notification to the Secretary of Commerce, prompt or otherwise, describes any amendment, modification, or other change to the substantive provisions of the Texas CMP requiring the CCN process at the PUC to conduct environmental review and assure consistency of energy facilities with the CZMA.

64.     No public hearings have been held, no notice given, no materials distributed, and certainly no explanation of "why the change is necessary and appropriate" has been provided. So far as Plaintiff knows, no such explanation exists.

65.     Indeed, so far as Plaintiff knows, no proposed amendment, modification, or other change to the Texas CMP was submitted, of any kind, before 2006.

66.     On July 11, 2006, Texas did submit proposed changes to the federal government. 31 Tex. Reg. 5829-30.   The submission purported to address all "changes to the [Texas] CMP since its approval ... in December 1996." *Id.* at 5829.   Texas claimed that all changes constituted "routine program changes", that is, not resulting in substantial changes to the five key program areas listed in CZMA regulations. *Id.*   Change to eliminate regulation of electric generating facilities would be significant, but the 2006 submission mentions no such change.

67.     Texas continues to certify compliance with federal requirements and take federal money pursuant to the CZMA based upon the continuing representation that it has the authority to regulate energy facilities within the Texas coastal zone.

68.     Thus, under the Texas CMP as approved and amended, no energy generating facilities can be built in the coastal zone without first obtaining a CCN, and during those proceedings (a) the PUC must conduct an environmental review and assure CZMA consistency and (b) "interested and affected parties" must have the opportunity to participate.

## V.     WITHOUT REQUIRED NOTICE, PUBLIC PARTICIPATION, OR APPROVAL, DEFENDANTS UNLAWFULLY CLAIM A STATUTE'S REPEAL ELIMINATES MANDATORY CZMA REVIEW OF THE CHALLENGED WIND FARMS

69.     Texas CMP regulations still commit to environmental reviews under the CZMA for energy generating facilities to be done within the process to consider CCNs by the PUC. 31 T.A.C. § 501.16(a & b) & § 25.102; *see also* Texas Natural Resources Code § 33.205 (still in effect) & § 33.2053(b) (still in effect).

70.     Notwithstanding these Texas CMP regulations, and notwithstanding the CZMA's continuing mandate for environmental review before building energy generating facilities in a coastal zone, Defendants now assert no process exists under which to complete a consistency review for the challenged wind farms.

71.     Defendants rely on repeal of a statute that, they agree, previously required CZMA environmental review of all energy generating facilities built in the coastal zone, a statute written into the Texas CMP, relied on for federal approval, and never amended out of the Texas CMP.

A.    **Defendants Deny Any Environmental Review under the CZMA or the Texas CMP for the Challenged Wind Farms.**

72.    Despite having been under discussion for several years, no environmental review has been completed pursuant to the CZMA or the Texas CMP for either of the challenged wind farms, one proposed to be constructed by Defendants Gulf Wind (a wholly owned subsidiary of Defendant Babcock & Brown) and the other proposed to be constructed by Defendant PPM.

73.    If complete and comprehensive environmental studies of the two wind farms exist, they have not been reviewed by any state or federal agency in official administrative proceedings.

74.    Plaintiff has repeatedly asked the Defendant PUC, and Defendant Patterson, to assure CZMA consistency review of the challenged wind farms, and has repeatedly been refused.

75.    To date, all Defendants have asserted that no process exists under the Texas CMP, or otherwise, for anyone to provide environmental review under the CZMA for the challenged wind farms.

76.    To date, all Defendants have asserted that no process exists for Plaintiff or anyone else to submit concerns of environmental destruction that before or during construction of the challenged wind farms, must be taken into account pursuant to the CZMA.

77.    To date, all Defendants have asserted the challenged wind farms can be built in the Texas coastal zone without completing environmental review or consistency determination pursuant to the CZMA.

78.    To date, all Defendants have asserted the challenged wind farms can be built in the Texas coastal zone without review by a state (or federal) agency with power to prevent or

regulate construction based on concerns of environmental destruction submitted by Plaintiffs or anyone else.

79.    In sum, Defendants have denied Plaintiff Alliance any meaningful participation to raise environmental impacts of the challenged wind farms.

**B.    As the Only Basis to Refuse to Review the Challenged Wind Farms under the CZMA, Defendants Rely on Repeal of a Statute that Previously Mandated the PUC Conduct Such Environmental Review in Proceedings for a CCN**

80.    As discussed *supra* Part IV.B, when reviewing and approving the Texas CMP, the federal government relied on a statutory mandate for the PUC to conduct CZMA consistency reviews when deciding whether to grant a CCN for any energy generating facility.

81.    In 1999, Texas repealed the part of the Public Utility Regulatory Act that required all new electric generating facilities to obtain CCNs from the PUC.

82.    This change did not become part of the Texas CMP, because neither Defendant Patterson nor any other Texas official ever gave CZMA-required notice, allowed CZMA-required public participation, or obtained CZMA-required federal approval for such a significant change. *Supra* Part IV.C.

83.    Still, PUC cites this 1999 amendment as the basis to refuse to evaluate or approve a CCN for energy generating facilities in the coastal zone, to never do any CZMA consistency review, and to deny any process exists for public participation required by the CZMA.

84.    No other agency took on responsibility to evaluate or approve CCNs, or otherwise review energy generating facilities to make CZMA consistency determinations and consider public input regarding environmental harms caused by building in the Texas coastal zone.

85.    As a result, the Texas CMP on paper purports to regulate and ensure consistency for all new electric generating facilities in the coastal zone through CCN procedures at the PUC, but no agency performs CCN reviews.

86.    Some energy generating facilities may be subject to some environmental review when they seek permits from another agency (*e.g.*, for air quality, or ocean uses) however, there is no basis to conclude that those agencies would conduct a review for consistency with the CZMA.    Further, as is the case here, if no such circumstance applies, Texas currently, unlawfully, purports to allow energy generating facilities to be built in the coastal zone with no CZMA consistency review and no public participation.

87.    The challenged wind farms fall squarely within the CZMA definition of "energy facility" and squarely within the Coastal Coordination Council definition of "electric generating facility".    However, for these wind farms, Defendants deny that any process exists during which to assure environmental review and public participation as required by the CZMA and the Texas CMP.

## VI.    DEFENDANT PATTERSON MADE A CALCULATED CHOICE NOT TO GIVE NOTICE, ALLOW PUBLIC PARTICIPATION, OR SEEK CZMA APPROVAL FOR THE REPEALED STATUTE TO BECOME PART OF THE TEXAS CMP

88.    Defendant Jerry Patterson, as Commissioner of the Texas General Land Office and Chair of the Texas Coastal Coordination Council since 2002, made a calculated choice not to disclose, to allow public participation, or to obtain federal approval of this significant change that unlawfully has been used to eliminate CZMA review for energy generating facilities.

### A.    Defendant Patterson Has Responsibility for Texas CMP Changes

89.    Texas designated the Land Office as the lead state agency for the CZMA.

90.     The CZMA requires establishing a lead agency: "the state must designate a single state agency to receive and administer the grants for implementing the management program." 15 C.F.R. § 923.47(a); *following* 16 U.S.C. § 1455(d)(6). "[D]esignation is designed to establish a single point of accountability for prudent use of administrative funds in the furtherance of the management and for monitoring of management activities." *Id.* § 923.47(b)(1).

91.     As lead agency, the Land Office, "is … the focal point for proper administration and evaluation of the State's program, and the entity to which [the federal government] will look when monitoring and reevaluating a State's program during program implementation." *Id.*

92.     As provided by CZMA regulations, and written into the Texas CMP, the Land Office has responsibilities to: "monitor and evaluate the management of the State's coastal resources by the various agencies and/or local governments with specified responsibilities …, to make periodic reports to the [federal oversight agency] … regarding the performance of all agencies involved in the program … [and] presenting evidence of adherence to the management program or deviation as part of the [federal] review … required by … the Act." 15 C.F.R. § 923.47(a)(2); Texas CMP Chapter III.A.3.

93.     In addition to serving as lead agency, the Land Office serves as staff for the Coastal Coordination Council under the Texas CMP, Chapter III.A.3. "As such, the [Land Office] will manage the daily operations of the program. *Id.* The Coordination Council has responsible to monitor agencies to assure "their continued compliance with the [Texas] CMP goals and policies[,] … monitoring agency enforcement of authorities[, and] … monitor all actions subject to consistency review, including *authorizations, development projects, and rule changes." Id.*, Chapter III.B.1 (emphasis added).

94.     "The monitoring responsibilities of the [Land Office, under Defendant Patterson] … primarily include tasks that support the Council's monitoring", and thus encompass monitoring of "authorizations, development projects, and rule changes." *Id.* Chapter III.B.2.  For this purpose, the Land Office ensures "that all monitoring information received by the Council is recorded, analyzed, and *presented to the appropriate parties.*" *Id.* (emphasis added).

95.     In addition to overarching responsibility for coordination, including coordination of consistency reviews, the Land Office (through its Coastal Management Division) is responsible for "coordinating implementation of the … energy facility siting plan, and other special planning elements by appropriate agencies …." *Id.*, Chapter III.A.3.

96.     Thus the Land Office, under Commissioner Patterson, is responsible to analyze, and to present "to the appropriate parties", the information about any changes in PUC authority to issue CCNs for energy facilities, as well as any other changes to implementation regarding the Texas CMP with respect to energy facilities.

**B.      Defendant Patterson Deliberately Refused to Make Federal Disclosure, Allow Public Participation, or Obtain Required Approval to Make Any Change in the Process to Review Energy Generating Facilities under the Texas CMP**

97.     In addition to knowing how the 1999 repeal of part of PURA in theory could significantly change practices regarding CZMA consistency determinations, Defendant Patterson knew this change could affect whether the wind farms at issue received environmental reviews.

98.     The wind farms now at issue have been under development for several years.

99.     Defendant Patterson advocates building these energy facilities in the coastal zone.

100.    Persons opposed to constructing these energy facilities, and others, including members of the Texas Coastal Coordination Council chaired by Defendant Patterson, repeatedly have alerted Defendant Patterson, the Land Office, and the Coastal Coordination Council of the

concern that repeal of the PUC's authority regarding CCN's for energy generating facilities could mean, in practice, that neither the PUC nor any other agency would review significant environmental impacts of the wind farms now at issue.

101.   In 2006, under Defendant Patterson's authority, the Land Office gave official notice, sought public participation, and sought federal approval for what it claims were *all* of the changes made to the Texas CMP since federal approval in 1996. 31 Tex.Reg. 5829-30. This submission never mentioned the statutory repeal affecting PUC authority regarding CCNs and, to the contrary, expressly claimed all changes were "routine" and not significant. *Id.*

102.   Defendant Patterson had the responsibility for the content of the 2006 federal submission that failed to mention repeal of the statute mandating energy generating facilities obtain CCNs from the PUC and failed to mention any potential impact of this repeal on the Texas CMP.

103.   Defendant Patterson decided the 2006 federal submission would not seek approval of the repeal of the statute mandating energy generating facilities obtain CCNs from the PUC, nor seek approval of any impact of this repeal on the Texas CMP.

104.   Defendant Patterson made all these decisions even though he actually knew that such change, if implemented, would eliminate the only process in which the state had committed to do CZMA consistency review for the wind farms at issue, long under discussion for Kenedy County, notwithstanding the CZMA mandates to which Texas previously committed.

105.   The decision not even to mention the statutory repeal, much less to seek approval of an amendment incorporating this repeal into the Texas CMP cannot be squared with Defendant Patterson's duties under federal and state law. *Supra* Part VI.A.

## VII.    THE CHALLENGED WIND FARMS WILL CAUSE SIGNIFICANT ENVIRONMENTAL HARMS IN THE COASTAL ZONE

106.    Development of the challenged wind farms requires development of the transmission lines to deliver the energy to the grid and both must be considered in order to evaluate environmental harms to the coastal zone. *See* 31 T.A.C. § 501.11(b & c) (for this "major action", the Texas CMP requires consideration of "cumulative and secondary adverse effects").

107.    Plaintiff has not seen complete and comprehensive environmental reviews (if any have been done) for all of the challenged wind farms.  However, even the partial environmental reviews circulated by Defendants confirm immense risks that must be studied and addressed by the regulatory process.

### A.    Immense Risks to Endangered and Threatened Species, Major Migration Routes, and Wetlands Confirms the Need for CZMA Consistency Review

108.    In 2007, the Texas Department of Parks and Wildlife described the site Defendants propose for the challenged wind farms and transmission lines as  "an area that has been described in the scientific literature as 'the last great habitat' due to the large expanses of undeveloped land in one of the most biologically diverse areas in the nation".

109.    This pristine, fragile, and unique ecology of the Laguna Madre and environs has been recognized to be of hemispheric importance, taking into account

(a)    the many endangered and threatened species living and using the habitat;

(b)    its central location on what American Bird Conservancy calls "the most important migratory corridor for neotropical birds in North America";

(c)    its lagoon, one of only three hypersaline bays in the world, surrounded by oak mottes, dunes, freshwater wetlands, coastal prairie and marshes, and wind tidal flats; and

(d)    wetlands that clean runoff and support above-described the rich ecology, also including habit for migratory waterfowl, shrimp, fish, and shellfish.

25.

No mere abstraction, this "last great habitat" also supports recreation such as bird watching, fishing, hunting, and nature study, all vital to the area economy.

110.    The challenged wind farms and transmission lines will industrialize some sixty thousand (60,000) acres, with the first phase including:

(a)    at least 240 massive towers, each over 400 feet tall with 60-ton turbines inside a large building, and each with 300 foot diameter rotor blades slicing through more than an acre at speeds six (6) times that of the wind;

(b)    the 160 ton towers sit on concrete pads more than 1000 tons, plugging up to 30 feet deep, with storage, maintenance yards, and related infrastructure; and

(c)    connecting roads and more than 20 miles of transmission lines (clearing 150' to 300' rights of way) that segment habitat, block water flow, and cause erosion and habitat destruction.

For such development, the proposed Kenedy County area provides a world-class worst site.

111.    Documentation prepared regarding the transmission line to serve the wind farms identifies "five federally listed endangered or threatened species" in the site area. For example, both the federal and Texas endangered species lists find the Northern Aplomado Falcon (*Falco femoralis*) and a wild cat, the ocelot (*Leopardus pardalis*), in the area proposed for industrialization.

112.    As recently as July 2007, the Texas Department of Parks and Wildlife wrote about a long list of endangered and threatened species at risk from the transmission lines alone. The federal Fish and Wildlife Service also has written to Defendant Babcock & Brown to invite a dialog about impacts and a potential "take", that is, killing of endangered or threatened species, a rare expression of great concern on the part of the agency.

113.    Threats to birds (including songbirds, waterfowl, and raptors) as well as bats, and butterflies arise because this area sits at the confluence of three main highways for migration. More than four hundred bird species travel through, in flocks tracked on radar, including more

than 20 species listed as federally or Texas endangered, threatened, or of special concern. Literally millions of birds (circum- and trans-Gulf Neotropical species) migrate through this area. Hundreds of thousands of birds can cross a one-mile line in just one hour during the fall and spring migrations.

114.   Endangered and protected species face at least four types of harm:  (a) direct impact with turbines; (b) habitat destruction from construction; (c) fragmentation of areas needed for land animals, such as the ocelot; and (D) vehicular traffic.  Sheer numbers of birds migrating long distances north and south, as well as hundreds of miles across the Gulf of Mexico, greatly exceed numbers in other areas where wind farms already have been found to cause problems. Moreover, frequent fog, storms and other adverse weather conditions common on the Gulf Coast increase risks when large flocks must fly at low altitudes, often greatly fatigued, and cannot easily maneuver around the hazards proposed to be created.

115.   For these reasons, it is the policy of the Texas Coastal Management Plan that "[e]lectric generating facilities shall be constructed at sites selected to have the least adverse effects practicable on … areas used for spawning, nesting, and seasonal migrations  of … wildlife species." 31 T.A.C § 501.16(a)(3).

116.   For these reasons (and others) federal siting parameters call for avoiding turbine placement in migration paths, or where bird are highly concentrated, or in daily movement flyways, or in locations documented to have endangered species.  The proposed site violates all these parameters.

117.   The National Research Council urges placement of wind farms in areas of already fragmented or degraded habitat, the very antithesis of this site.

118.    Moreover, the National Wetland inventory identifies a matrix of wetlands on the site, protected by the Clean Water Act.  Defendants inconceivably claim they can "avoid" wetlands, ignoring the inescapable interference of their miles of multiple road systems (and huge tower bases and other facilities) that would divert sheet flows of water across the coastal areas.

119.    The wind farms proposed to be constructed within Kenedy County have direct and significant impacts on coastal waters.

120.    Texas Parks and Wildlife recognizes that this "last great habitat" is "heavily utilized by different species at different times of the year", and specifically questioned the value of the limited environmental data provided by for the transmission lines.  In September 2007 the agency wrote that, due to lack of information provided, it could not evaluate whether one route or another would result in fewer adverse environmental impacts.

121.    Comprehensive data from the wind farm developers has not even been presented to the public, much less subjected to scrutiny and review.  Defendants have not been required to fairly address any of Plaintiff's concerns, concerns of state and federal agencies, or concerns of anyone else, not in a public hearing and not otherwise.

122.    Plaintiff's concerns reflect additional information that cannot all be digested here, reflecting work by many scientists of immense experience, including scientists who support development of wind power both in general and at specific sites elsewhere in the nation.  The critical issues Plaintiff and the scientists identify do not disappear simply because Defendants unlawfully prefer not to address them as required by the CZMA and the Texas CMP.

**B.    Predicable Harms to Economic, Environmental, and Recreational Interests of Plaintiff's Members, Protected by the CZMA, Establishes Standing**

123.    All Defendants deny there is an opportunity for Plaintiff Alliance to participate in any proceeding regarding the two wind farms, because there is no agency review, no permit required, and no consistency determination.

124.    As a result of Defendants' actions, Plaintiff Alliance has been denied its legal rights under the CZMA and the Texas CMP to participate in review of wind farms that are to be built wholly within the coastal zone.

125.    Construction of the wind farms is imminent, and will cause irreparable harm to the environmental values of the Texas coastal zone, and to the interests of the members of Plaintiff Alliance and its members.

126.    The CZMA explicitly states that it is "national policy" to "encourage the participation and cooperation of the *public*, state and local governments . . . in carrying out the purposes of [the statute]." 16 U.S.C. § 1452(4) [emphasis added].

127.    The Coastal Habitat Alliance was formed to protect the unique environmental values, including the habitats and wildlife of the Texas gulf coast.

128.    The member organizations that make up the Alliance have individual members who live, work and play along the Texas gulf coast. See ¶14.

129.    The Coastal Bend Audubon Society organizes events and field trips to observe birds and other wildlife in the coastal region affected by the proposed projects. The Coastal Bend Audubon Society is a conservation organization devoted to preserving and enjoying the natural resources that live in, and migrate through the coastal region affected by the proposed projects. This purpose is germane to the interests of the Coastal Bend Audubon Society and its members and that they seek to be protect in this matter.

130.    The Frontera Audubon Society is an organization dedicated to preserving the environment in the Rio Grande Valley. Its members engage in bird watching, butterfly watching, general nature viewing, and try to make the connection between people and nature.

131.    The Houston Audubon Society is an organization whose mission is to promote the conservation and appreciation of birds and wildlife habitat. The Houston Audubon Society conducts bird watching field trips along the Gulf Coast associated with the migratory and endangered species that are affected by the proposed projects. This purpose is directly germane to the interest in the potential impacts to migratory birds associated with this project.

132.    The Lower Laguna Madre Foundation is an organization whose mission is to protect the living resources of the Lower Laguna Madre. Members of the Lower Laguna Madre Foundation use this coastal area for fishing and/or bird watching. Mr. Walter A. Kittelberger is Chairman of the Board of Trustees for the Lower Laguna Madre Foundation and has fished and hosted bird watching trips throughout the Laguna Madre. All the members of the Foundation use the Laguna Madre and realize that its protection is directly related to what occurs on the ranchlands adjacent to the Laguna Madre. The Foundation has worked with USFWS to ensure that the endangered Ocelot is protected, and has been concerned for years about the reintroduction of species such as the Aplomado falcon to the coastal grasslands adjacent to the Laguna Madre. The protection of this natural resource is directly related to the impacts of the proposed projects because alteration or impedance of the sheet flow across the Kenedy Ranch land resulting from the construction of the turbines, roads and associated facilities would irreparably harm the environment of the Lower Laguna Madre.

133.    The King Ranch Inc. owns lands immediately adjacent to the proposed project properties. The King Ranch is committed to the preservation of habitat of the region, and uses its

own nearby properties for bird watching, wildlife tourism, and hunting. The King Ranch yields more net revenue from these activities than its other agricultural operations on their lands. The construction and operation of the turbines, roads and other associated infrastructure will fragment the pristine habitat of the area, impact wildlife, including endangered species and migratory birds, and could forever diminish the economic activities on the adjacent King Ranch properties.

134.   The interests of Plaintiff Alliance, along with the specific interests of its association members, and their individual members will be irreparably harmed by Defendants as a result of their conduct. These interests are germane to the purpose of the Plaintiff Alliance, and germane to the missions of its members, who each would have standing to sue in their own behalf.

135.   Defendants Texas Gulf Wind and PPM intend to have the two wind farms operational before the end of 2008.

136.   Defendants Texas Gulf Wind and PPM intend to greatly expand the size of the two wind farms by building additional wind turbines, and covering tens of thousands of additional acres of the coastal zone.

137.   These expansions could as much as triple the size of the two wind farms.

138.   These expansions have already been planned and/or announced by Defendants Texas Gulf Wind and PPM.

139.   Unless this Court makes a judicial determination sought in this complaint, these expansions may also not be subject to any environmental review or consistency determinations.

140.    Unless this Court makes a judicial determination sought in this complaint, Plaintiff Alliance will have to seek to intervene in future proceedings to seek the same environmental review and consistency determination that it is being currently denied.

141.    Unless this Court makes a judicial determination sought in this complaint, all Defendants will continue to interpret current laws and regulations as not providing any avenue for public participation, permitting, environmental review or consistency determinations.

142.    Therefore, this matter is fit for judicial determination, and Plaintiff Alliance will suffer hardship now and again in the near future if judicial consideration is withheld.

143.    If this Court grants the relief sought by Plaintiff Alliance, their legal rights guaranteed by existing laws and regulations will be protected

### VIII.   CAUSE OF ACTION

144.    Plaintiff incorporates by reference the foregoing pleadings in each count below.

### Count I:  Declaratory Relief

145.    Plaintiff and Defendants have an actual, substantial, legal controversy concerning the force of the Coastal Zone Management Act, the Texas Coastal Management Program as approved, the National Environmental Policy Act, and the United States Constitution as applied to the challenged wind farms and transmission lines.

146.    To stop the on-going denial of its rights, Plaintiff seeks a judicial declaration of Defendants' obligations pursuant to 28 U.S.C. § 2201 & 2202, as well as 42 U.S.C. § 1983.

### Count I-A:  Coastal Zone Management Act

147.    Contrary to the Coastal Zone Management Act, and contrary to the Texas Coastal Management Program as approved:

(a) Defendants assert the challenged wind farms can be built without ever undergoing any environmental review under the CZMA;

(b) Defendants assert the challenged wind farms can be built without ever undergoing any review that provides for public participation under the CZMA; and

(c) Plaintiff has been precluded from obtaining environmental review, and from participating in any meaningful review of the challenged wind farms.

148.   Taking into account the specific CZMA requirement to cover all energy facilities, as well as specific requirements for any amendment to the Texas CMP, Defendants cannot evade all consistency review for the wind farms by citing the repeal of a statute.  If the Texas CMP does not provide proper process to conduct environmental review for wind farms, the challenged wind farms cannot be built in the coastal zone.

### Count I-B: National Environmental Policy Act

149.   Even if the CZMA would permit an amendment to the Texas CMP that eliminates all environmental review of wind farms in the coastal zone (which Plaintiff denies), and even if somehow the Texas CMP could be amended in this way without disclosure, public participation, and federal approval (subject to judicial review), still the Texas CMP could not be amended in this way without review under NEPA, which entails specific federal notice and an opportunity to be heard for Plaintiff (among others).

### Count I-C:  Due Process under the United States Constitution

150.   The CZMA, implemented by the Texas CMP as approved, as well as NEPA, provide specific property rights for Plaintiff to present claims that the challenged wind farms should not be approved because of environmental considerations, as well as specific property rights to present claims that the Texas CMP should not be amended, including rights to public participation and rights to judicial review.

151.   The Due Process Clause of the United States Constitution, Amendments V & XIV, precludes denial of Plaintiff's rights under the CZMA, the Texas CMP, and NEPA.

### Count II:  Injunctive Relief

152.   Plaintiff has made every effort to assert its rights, which Defendants deny.

153.   Defendant Patterson and the Defendant PUC Commissioners refuse to require a CCN for the proposed wind farms and refuse to conduct the required environmental review as part of a consistency determination under the CZMA and Texas CMP.

154.   If Defendants Texas Gulf Wind, Babcock & Brown, and PPM Energy proceed with construction of the wind farms and transmission lines as currently planned, Plaintiff will suffer significant irreparable harm that, if not already begun, is imminent.

155.   Plaintiff has no adequate remedy at law.

156.   The public interest will be greatly served by any injunction that secures protection that Congress created under the CZMA and NEPA, and that Texas CMP also secures, particularly because of the special sensitivity of the "last great habitat" now at issue.

157.   All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

### IX. PRAYER

**WHEREFORE**, Plaintiff respectfully requests that the Court issue:

A.  Declaratory judgments:

      1.   Defendants Texas Gulf Wind, Babcock & Brown, and PPM Energy may not build any part of the challenged wind farms in the Texas Coastal Zone before completing environmental review required pursuant to the CZMA and Texas CMP; and

2.     In any proceeding to consider the environmental consequences of the challenged wind farms under the CZMA and Texas CMP, Defendants must allow Plaintiff an opportunity to be heard as an interested and affected party and, as specifically promised by the Texas CMP, the opportunity of judicial review as appropriate;

B.     Permanent and, as may be appropriate, preliminary injunctive relief that, until and unless they undergo proper environmental review under the CZMA, with the required public participation including Plaintiff, the proposed wind farms in the Texas Coastal Zone may not be built, in whole or part, by Defendants Texas Gulf Wind/Babcock & Brown or PPM Energy;

C.     An Order awarding Plaintiff the costs incurred in this litigation, including attorney fees pursuant to 42 U.S.C. § 1988;

D.     All other relief the Court deems just and proper.

BLACKBURN CARTER, P.C.

by: _____
JAMES B. BLACKBURN, JR.
Attorney in charge
TBN 02388500
4709 Austin
Houston, Texas  77004
713/524-1012
713/524-5165 (*fax*)

**OF COUNSEL:**
BLACKBURN CARTER, P.C.
Mary W. Carter
TBN 03926300
Charles W. Irvine
TBN 24055716
4709 Austin
Houston, Texas  77004
713/524-1012
713/524-5165 (*fax*)

David A. Kahne
TBN 00790129
LAW OFFICE OF DAVID A. KAHNE
P.O. Box 66386
Houston, Texas  77266
713/652-3966
713/652-5773 (*fax*)

*Counsel for Plaintiff Coastal Habitat Alliance*